[Cite as *State v. Rau*, 2013-Ohio-5664.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PAULDING COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,             CASE NO.  11-13-06

      v.

SCOTT M. RAU,                      **O P I N I O N**

      DEFENDANT-APPELLANT.

STATE OF OHIO,

      PLAINTIFF-APPELLEE,              CASE NO.  11-13-07

      v.

SCOTT M. RAU,                      **O P I N I O N**

      DEFENDANT-APPELLANT.

**Appeals from Paulding County Court**
**Trial Court No. CRB1200438AB and TRC 1201817 AB**

**Judgments Affirmed**

**Date of Decision:  December 23, 2013**

**APPEARANCES:**

     *Steven J. Furnas* **for Appellant**

     *Matthew A. Miller* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant Scott M. Rau ("Rau") appeals the June 20, 2013, judgment entries of the Paulding County Court sentencing Rau to 10 days in jail after Rau was convicted of OVI in violation of R.C. 4511.19(A)(1)(a) and Endangering Children in violation of R.C. 2919.22(C)(1), both first degree misdemeanors.

{¶2} The facts relevant to this appeal are as follows. On December 2, 2012, Rau was traveling with his daughter and his dog in his vehicle when he was stopped by Trooper Shawn Cook for having a loud exhaust system. Due to the dog's presence in the vehicle at the time of the stop, Trooper Cook asked Rau to exit the vehicle and Rau voluntarily complied.

{¶3} When Rau exited the vehicle, Trooper Cook detected an odor of burnt marijuana about Rau's person. Trooper Cook then conducted a probable cause search of Rau and recovered a "wooden dugout" in Rau's front pocket. Subsequently, Trooper Cook asked Rau to perform field sobriety tests. Trooper Cook had Rau perform the HGN test, the walk and turn test, and the one leg stand test. In addition, Trooper Cook had Rau perform the "Romberg balance test" and Trooper Cook took Rau's pulse. Based on the totality of the circumstances, Trooper Cook arrested Rau.

{¶4} Rau was charged in Traffic Case number 12TRC1817 with OVI in violation of R.C. 4511.19(A)(1)(a), a first degree misdemeanor, and Defective Exhaust System (Loud Exhaust) in violation of R.C. 4513.22, a minor misdemeanor. Rau was charged in criminal case number 12CRB438 with two counts of Possession of Drug Paraphernalia, in violation of R.C. 2925.141(C), both minor misdemeanors, and one count of Endangering Children in violation of R.C. 2919.22(C)(1), a first degree misdemeanor.

{¶5} On December 6, 2012, Rau was arraigned. At arraignment, the State noted that the two counts of Possession of Drug Paraphernalia in criminal case number 12CRB438 were duplicitous, so the State moved to dismiss one of the counts.[1] Rau pled not guilty to the remaining charges against him.

{¶6} On February 20, 2013, Rau filed a motion to suppress evidence in both his traffic and his criminal case. (Doc. 4); (Doc. 6). In the motions, Rau argued that there was no lawful ground to initiate a traffic stop, and further, that there was no probable cause to place Rau under arrest. (*Id.*); (*Id.*)

{¶7} On April 28, 2013, a hearing was held on Rau's Motion to Suppress. Trooper Cook testified at the hearing that he stopped Rau for a loud exhaust system. (Tr. at 7). Later, on cross-examination, Trooper Cook also testified that he thought Rau had a light out near his license plate. (*Id.* at 40-41).

---

[1] Although the State mentioned at the hearing that "it looks like the officer meant to charge [one of the counts] as a possession of marijuana not * * * a possession of drug paraphernalia" there is no indication that the State refiled or amended the charge to possession of marijuana. (Arraignment Tr. at 12).

{¶8} Trooper Cook testified that when he approached Rau's vehicle, he noticed that Rau and one other person were in the car (the other person was Rau's daughter). (*Id*. at 8). Trooper Cook also noticed that there was a large dog in the vehicle. (*Id*.) Trooper Cook testified that in his experience, dogs get anxious, so he asked Rau to exit the vehicle. (*Id*. at 9). Rau did so voluntarily. (*Id*.)

{¶9} Trooper Cook testified that he was trained in the identification of drugs and was certified as a "drug recognition expert." (Tr. at 18). Trooper Cook testified that when he began speaking with Rau, he detected an odor of burnt marijuana about Rau's person. (Tr. at 9). Trooper Cook testified that he then searched Rau and located a "wooden dugout" in Rau's right front pocket. According to Trooper Cook, a "wooden dugout" is "a container that has two reservoirs in it[.] * * * [O]ne reservoir usually contains the loose marijuana * * * and the other reservoir usually contains some sort of silver or metal smoking device cylinder." (Tr. at 11). Trooper Cook testified that "both of them were inside this particular wooden dug out." (*Id*.)

{¶10} Trooper Cook then asked Rau to perform field sobriety tests, which Rau agreed to do. Trooper Cook testified that he first administered the HGN test on Rau, and observed no clues of impairment. (Tr. at 43).

{¶11} Next, Trooper Cook testified that he had Rau perform the walk and turn test. Trooper Cook testified that as part of the test, he noticed two

"standardized" clues. Those clues included Rau taking the incorrect number of steps and Rau raising his arms above six inches for balance. (Tr. at 16). Trooper Cook also testified that as he was evaluating Rau for being under the effects of a drug of abuse rather than alcohol, he was also looking for other indications such as "leg tremors," which he noted were present during this test. (Tr. at 16-17).

{¶12} Trooper Cook next had Rau perform the one-leg stand test. As part of that test, Trooper Cook testified that he noticed "some leg tremors" and that Rau had a "slow body clock." (Tr. at 22).

{¶13} Trooper Cook then had Rau perform the "Romberg balance test." (Tr. at 23). Trooper Cook described the "Romberg balance test" as follows.

> **I would tell them to stand with their feet together, their arms down at their side, tilt their head back, close their eyes. Um, and as they have their head tilted back and their eyes are closed I instruct them to estimate the passage of thirty seconds. Um, and again, when they have reached the passage of thirty seconds to tilt their head forward ah, then I would know that they have reached the passage of thirty seconds.**

(Tr. at 24). Trooper Cook testified that during this test, he was "looking for leg tremors, body tremors, eyelid tremors, * * * swaying from side to side for [sic] back to front, but specifically ah, directed towards the internal body clock again we're looking for someone's count that would be sped up ah, verses slowed down[.] (*Id*. at 25).

{¶14} Trooper Cook testified that he learned of the Romberg balance test during NHTSA training at the academy, during the drugs and impaired section, and that he was reintroduced to it during his training as a drug recognition expert. (Tr. at 24).

{¶15} Trooper Cook testified that when Rau performed the Romberg balance test, Rau "tilted his head forward" rather than backward, and "he indicated the passage of thirty in a timed count of * * * forty three seconds," again indicating a "slow body clock." (*Id*. at 23)

{¶16} Trooper Cook testified that he then checked Rau's pulse, and found that it was ninety beats per minute. (Tr. at 26).

{¶17} After he finished with the field testing, Trooper Cook testified that "[b]ased on the odor of burnt marijuana and also based on the totality of the circumstances that included the ah, Field tests I concluded that the Defendant ah, was ah, operating a vehicle under the influence of cannabis, ah in this case specifically marijuana." (Tr. at 27).

{¶18} The video of the stop was played at the hearing. (State's Ex. 2). On cross-examination, Rau's counsel inquired into whether Rau passed or failed the individual tests that were conducted. In response, Trooper Cook testified that, "at the time for a drug evaluation I'm not determining whether or not it's a pass or fail

at that moment it's the totality of the circumstances, it's everything that has been observed and collected throughout the entire process." (Tr. at 46).

**{¶19}** After closing arguments, the court took the matter under advisement. On May 22, 2012, the court issued entries overruling Rau's suppression motions. (Doc. 7); (Doc. 10).

**{¶20}** On June 17, 2013, Rau agreed to plead "no contest" to Child Endangerment in violation of R.C. 2919.22(C)(1), a first degree misdemeanor, and OVI, as amended, in violation of R.C. 4511.19(A)(1)(a).[2] (Doc. 12); (Doc. 8). Rau was then sentenced to serve 10 days in jail, with 7 days work release granted. (*Id*.); (*Id*.) Judgment entries reflecting this were filed on June 20, 2013. (*Id*.); (*Id*.)

**{¶21}** It is from these judgments that Rau appeals, asserting the following assignments of error for our review.

> **FIRST ASSIGNMENT OF ERROR**
> **THE TRIAL COURT ERRED IN FINDING THAT OHIO STATE HIGHWAY TROOPER WAS JUSTIFIED IN CONDUCTING A TRAFFIC STOP OF APPELLATE'S** [sic] **VEHICLE.**
>
> **SECOND ASSIGNMENT OF ERROR**
> **THE TRIAL COURT ERRED IN FAILING TO EXCLUDE OFFICER[']S TESTIMONY CONCERNING THE RESULTS OF A FIELD SOBRIETY TESTS** [sic] **THAT WERE NOT ADMINISTERED IN SUBSTANTIAL COMPLIANCE WITH TESTING STANDARDS.**

---

[2] By agreement, this OVI was treated as a first OVI in 6 years rather than a second.

*Standard of Review*

**{¶22}** An appellate court's review of a decision on a motion to suppress involves issues of both law and fact. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. During a suppression hearing, the trial court acts as the trier of fact and sits in the best position to weigh the evidence and evaluate the credibility of the witnesses. *Id.,* citing *State v. Mills,* 62 Ohio St.3d 357, 366 (1992). Accordingly, an appellate court is required to uphold the trial court's findings of fact provided they are supported by competent, credible evidence. *Id.,* citing *State v. Fanning,* 1 Ohio St.3d 19 (1982). Once an appellate court determines the trial court's factual findings are supported by the record of the hearing, the court must then engage in a *de novo* review of the trial court's application of the law to those facts. *State v. Lett,* 11th Dist. No. 2008–T–0116, 2009-Ohio-2796, ¶ 13, citing *State v. Djisheff,* 11th Dist. No. 2005–T–0001, 2006-Ohio-6201, ¶ 19.

*First Assignment of Error*

**{¶23}** In Rau's first assignment of error, he argues that the trial court improperly concluded that Trooper Cook initiated a valid traffic stop. Specifically, he contends that Trooper Cook did not establish that Rau's exhaust was loud or defective and that there was no indication that Rau's rear license plate light was out.

{¶24} A law enforcement officer must have a "reasonable articulable suspicion" that a person is or has been engaged in criminal activity before he is justified in initiating a traffic stop. *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S.Ct. 1868, (1968). "This standard requires something less than probable cause; an officer's belief that a person is acting in violation of the law is sufficient to justify an investigatory stop." *State v. VanScoder*, 92 Ohio App.3d 853, 855 (9th Dist.1994).

{¶25} Trooper Cook testified that he stopped Rau under suspicion of a defective muffler in violation of R.C. 4513.22, which reads

> **(A) Every motor vehicle * * * with an internal combustion engine shall at all times be equipped with a muffler which is in good working order and in constant operation to prevent excessive or unusual noise, and no person shall use a muffler cutout, by-pass, or similar device upon a motor vehicle on a highway. * * ***
>
> **No person shall own, operate, or have in the person's possession any motor vehicle * * * equipped with a device for producing excessive smoke or gas, or so equipped as to permit oil or any other chemical to flow into or upon the exhaust pipe or muffler of such vehicle, or equipped in any other way to produce or emit smoke or dangerous or annoying gases from any portion of such vehicle, other than the ordinary gases emitted by the exhaust of an internal combustion engine under normal operation.**
>
> **(B) Whoever violates this section is guilty of a minor misdemeanor.**

{¶26} Regarding initiating the traffic stop, Trooper Cook testified that when Rau drove past Trooper Cook's patrol car, Trooper Cook "heard the exhaust

system to be defective" and "louder than normal." (Tr. at 7). By louder than normal, Trooper Cook clarified, testifying, "[b]asically, * * * when the vehicle past [sic] me with my windows up I could hear noise, * * * which was being emitted from the exhaust system." (*Id.*) Trooper Cook testified that he believed the vehicle was in violation of R.C. 4513.22, so he initiated a traffic stop. (*Id.* at 8)

{¶27} On appeal, Rau contends that on the video of the traffic stop, his car does not sound as though its exhaust system is defective or loud. Rau claims that on the video, once the audio is available, other cars can be heard passing by and Rau's dog can be heard barking, but the exhaust/muffler from Rau's vehicle appears no louder than the passing cars.

{¶28} Despite Rau's arguments, Trooper Cook testified that he believed Rau had a loud/defective exhaust. In *State v. Williams*, 2nd Dist. No. 21723, 2007-Ohio-4617, the Second District Court of Appeals found that "observation of a loud muffler provides sufficient reasonable suspicion of a violation of R.C. 4513.22 to justify the stop of a motor vehicle[.]" *Williams* at ¶ 9. This is exactly the testimony provided by Trooper Cook, and the trial court found Trooper Cook to be a credible witness. The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230 (1967).

{¶29} Moreover, we would note that the audio on the videotape does not begin until Rau's vehicle is already stopped, so nothing at all can be heard on the video to confirm or refute Trooper Cook's testimony regarding the "louder than normal" exhaust system operating when Rau was driving past Trooper Cook. Once Rau's vehicle is stopped, it is unclear whether it is running, making it impossible to tell if the exhaust is loud, particularly since the vehicle was not moving.

{¶30} Accordingly, we cannot find that Trooper Cook lacked reasonable articulable suspicion of criminal activity to initiate a traffic stop.[3] Therefore, Rau's first assignment of error is overruled.

*Second Assignment of Error*

{¶31} In Rau's second assignment of error, he argues that the trial court incorrectly allowed testimony from Trooper Cook concerning the results of field sobriety tests that were not "administered in substantial compliance with testing standards." Specifically, he contends that Trooper Cook administered tests that "were not standardized" and that Rau would have passed "standardized testing."

---

[3] Rau makes a second argument under this assignment of error, claiming that Trooper Cook lacked "reasonable articulable suspicion" to stop him for a light that was out near Rau's license plate. However, Trooper Cook never testified that he stopped Rau for the light being out, and he did not cite Rau for a violation regarding the light. Trooper Cook testified merely that he spoke with Rau about the light. Thus we decline to further address this argument, particularly since we have already found that Trooper Cook had reasonable articulable suspicion to stop Rau for the exhaust system.

{¶32} In order for the results of field sobriety tests to be admissible, the State is not required to show strict compliance with testing standards, but must instead demonstrate that the officer substantially complied with NHTSA standards.  R.C. 4511.19(D)(4)(b); *State v. Blair*, 3d Dist. No 9-12-14, 2013-Ohio-646, ¶ 31.  "A determination of whether the facts satisfy the substantial compliance standard is made on a case-by-case basis."  *State v. Fink,* 12th Dist. Nos. CA2008–10–118, CA2008–10–119, 2009–Ohio–3538, ¶ 26.  The State may demonstrate what the NHTSA standards are through competent testimony and/or by introducing the applicable portions of the NHTSA manual.  *State v. Boczar,* 113 Ohio St.3d 148, 2007–Ohio–1251, ¶ 28.

{¶33} In addition to standardized tests, nonstandardized tests "are useful sources of information regarding the suspect's sobriety. If circumstances dictate that methods other than strictly standardized tests must be used in determining whether a driver is under the influence * * * then an officer should be able to use nonstandardized tests that, based upon his experience, can indicate impairment * * *."  *State v. Menking*, 4th Dist. No. 02CA66, 2003-Ohio-3515, ¶ 14, quoting *State v. Walker*, 11th Dist. No. 2001-A-0086, 2002-Ohio-4362, at ¶ 14.

{¶34} In this case, despite his phrasing of the assignment of error, Rau does not argue that Trooper Cook failed to substantially comply with NHTSA standards while conducting the "standardized" field sobriety tests (the HGN test, the walk

and turn test, and the one-leg stand test). Rather, Rau contends that Trooper Cook did not administer the Romberg balance test, or take Rau's pulse, in substantial compliance with recognized standards, and that those non-standardized tests should have been suppressed. In addition, Rau contends that he "passed" standardized testing.

{¶35} After Trooper Cook collected clues on the "standardized" NHTSA tests he continued testing Rau by having Rau perform the "Romberg balance test" Trooper Cook had learned as part of his NHTSA training and as part of his training as a drug recognition expert. At the suppression hearing, Trooper Cook identified how the Romberg balance test was performed and then testified to Rau's performance on that test. Trooper Cook subsequently took Rau's pulse, describing how and where he took Rau's pulse.

{¶36} Trooper Cook testified that there is a "12-step" process DRE standards would have him go through to identify someone under the influence of drugs. However, as Rau concedes in his brief, Ohio has not adopted "the DRE [drug recognition] standards and is not a DRE State." As Ohio is not a DRE state, Trooper Cook testified that he performed an abbreviated version of drug recognition, still relying on all of the clues of impairment he uncovered from *all* of the tests he conducted and the surrounding circumstances to aid him in determining whether Rau was intoxicated.

{¶37} There is no indication in the record that Trooper Cook failed to substantially comply with NHTSA standards on the standardized tests and Rau is unable to establish how Trooper Cook's observations of Rau in the remaining two tests were inadmissible, as an officer's observations in non-standardized tests can be used to determine a subject's sobriety. *See Menking*, *supra*; *Walker*, *supra*. Moreover Rau does not establish, and makes no claim, how Trooper Cook improperly administered the Romberg balance test or improperly took Rau's pulse.

{¶38} Finally, although Rau claims that he did not "fail" any of the individual tests, it is unclear how this would warrant suppression of testimony regarding Rau's performance on the tests. It would simply go to the weight of the evidence. Furthermore, Trooper Cook testified that unlike evaluating alcohol cases in field sobriety tests, that for drugs, when he was conducting the standardized tests, he was "not determining whether or not it's a pass or fail at that moment it's the totality of the circumstances, it's everything that has been observed and collected throughout the entire process." (Tr. at 46). Trooper Cook never testified that Rau specifically "failed" a test, he merely testified that the clues he detected added to the totality of the circumstances that Rau was operating a vehicle while intoxicated. Those clues ultimately included the clues that Trooper Cook received on the walk and turn test, the one leg stand test, the slow

body clock on the Romberg balance and the one leg stand tests, the leg tremors throughout the tests, the odor of burnt marijuana on Rau, Rau's pulse, and the wooden dugout found on Rau.

{¶39} Under these circumstances, we cannot find that the trial court erred in overruling Rau's motion to suppress. Accordingly, Rau's second assignment of error is overruled.

{¶40} For the foregoing reasons, Rau's assignments of error are overruled and the judgments of the Paulding County Court are affirmed.

***Judgment Affirmed***

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**